IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**ANTHONY LUCERO, KEN DAHLSTROM,
JOHN MINTER,** and **CLAUDIA ROMERO**

      **Plaintiffs,**

v.                                                       No. CIV 07-499 JCH/RLP

**THE NEW MEXICO LOTTERY;**
**TOM ROMERO**, Individually and In His Official Capacity
As The Chief Executive Officer of the New Mexico Lottery;
**PAT BEARE**, Individually and In His Official Capacity
As The Director of Sales of the New Mexico Lottery; and
**Evelyn McKnight** Individually and In Her Official Capacity
As The Director of Human Resources of the New Mexico Lottery**;**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendants' *Motion to Dismiss or for Judgment on the Pleadings as to Plaintiffs' Section 1983 Claims* [Doc. no. 47]. Among the claims brought by Plaintiffs, four former employees of the New Mexico Lottery, are two claims brought pursuant to 42 U.S.C. § 1983. Defendants are correct that if an entity constitutes an "arm of the state," then neither the entity nor its officials sued in their official capacity are "persons" within the meaning of § 1983 and the entity and its officials would have immunity from such claims. However, because for the reasons discussed below the Court concludes that the New Mexico Lottery is not an "arm of the state," the Defendants' motion is DENIED.

The key issue this decision must resolve is whether the New Mexico Lottery Authority ("NMLA") is an arm of the state or an independent political subdivision of the state. A cause of action brought under 42 U.S.C. § 1983 requires the deprivation of a plaintiff's civil rights "by a

'person' acting under color of state law." *McLaughlin v. Bd. of Trs. of State Colls. of Colo.*, 215 F.3d 1168, 1172 (10th Cir. 2000). The well-settled law in the Tenth Circuit is that "a governmental entity that is an arm of the state for Eleventh Amendment purposes is not a 'person' for § 1983 purposes." *Id.* Additionally, if a governmental entity is an arm of the state, "neither [that entity] nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Therefore, if the NMLA constitutes an arm of the state, no § 1983 claims may be brought against it or its officials in their official capacity.[1]

Eleventh Amendment immunity only extends to states and to governmental entities that are "arms of the states." *See Duke v. Grady Mun. Schools*, 127 F.3d 972, 974 (10th Cir. 1997). The Tenth Circuit has stated that a court should make two general inquiries in determining whether an entity is an arm of the state for purposes of the Eleventh Amendment. The court should "examine[] the degree of autonomy given to the agency, as determined by the characterization of the agency by state law and the extent of the guidance and control exercised by the state." *Sturdevant v. Paulson*, 218 F.3d 1160, 1164 (10th Cir. 2000) (quoting *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574-75 (10th Cir. 1996). The court should also "examine[] the extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing. The governmental entity is immune from suit if the

---

[1] The Court notes that only the §1983 claims against the NMLA and its officials acting in their *official* capacity would be dismissed if the NMLA were found to be an arm of the state. Plaintiffs have also brought § 1983 claims against Defendants in their *individual* capacities. State officials sued in their individual capacities are considered "persons" for the purposes of § 1983. *Hafner v. Melo*, 502 U.S. 21, 31 (1991). Thus, even if the NMLA were considered an arm of the state, Plaintiffs' § 1983 claims against the Defendants in their individual capacities would be unaffected.

money judgment sought is to be satisfied out of the state treasury." *Id*.

The Tenth Circuit has continued to rely on these factors, and has broken them down in further detail:

> Under the general rubrics of autonomy and financial independence, we have identified several other factors relevant to the arm-of-the-state determination: 1) The characterization of the governmental unit under state law; 2) The guidance and control exercised by the state over the governmental unit; 3) The degree of state funding received; and 4) The governmental unit's ability to issue bonds and levy taxes on its own behalf.

*Sturdevant*, 218 F.3d at 1166 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). The *Sturdevant* court first looked at where legal liability for a judgment would fall, and then moved on to the factors of autonomy and financial independence discussed above. Addressing each of these considerations in turn, the Court concludes that, on balance, the NMLA should not be considered an arm of the state.[2]

A.  Legal Liability for a Judgment

The *Sturdevant* court began its analysis with the factor of state treasury liability, calling it "particularly important." *Sturdevant*, 218 F.3d at 1164. In looking at state treasury liability, a court should focus on legal liability for a judgment as opposed to the practical or indirect effect a judgment could have on a state's treasury. *See id.*; *Duke*, 127 F.3d at 981. In this case, the legislature appears to have ensured that a monetary judgment against the NMLA would not directly implicate the state's treasury. N.M.S.A. 1978 § 6-24-25 (1995), entitled "Prohibition on Use of State Funds," states that the lottery shall be self-funded and that no transfer of state funds

---

[2] For an analysis of an analogous lottery statute that incorporates similar factors and reaches the same result, see *Burrus v. State Lottery Comm'n of Ind.*, No. 05-cv-1263, 2008 U.S. Dist. LEXIS 1770 (S.D. Ind. Jan. 7, 2008) and *Shisler v. State Lottery Comm'n of Ind.*, No. 07-cv-1190, 2008 U.S. Dist. LEXIS 34566 (S.D. Ind. Apr. 25, 2008).

can be used or obligated to pay the expenses of the NMLA.  In addition, the provision states that no claim for the payment of any lottery expense shall be made against any money other than that credited to the NMLA.  Nothing in the legislation or anything that Defendants have pointed to indicates that a judgment against the NMLA would be considered anything other than a "lottery expense," or that payment of a judgment could come from any source other than lottery funds.

Defendants argue that a judgment against the NMLA could have a secondary effect on the state treasury and the state's citizens because the judgment would come out of lottery revenues that could otherwise be available for tuition assistance to the state's residents.  *See Defendants' Reply Brief* [Doc. no. 56] at 4.  This argument ignores the command that courts focus on the legal, rather than practical, effect of the liability.  *See, e.g., Duke*, 127 F.3d at 981 (holding that indemnification by the New Mexico Public Schools Insurance Authority would not be equivalent to legal liability upon the state of New Mexico); *Sutton v. Utah State Sch. for the Deaf and Blind*, 173 F.3d 1226, 1233 (10th Cir. 1999) ("The key question is whether funds to satisfy a money judgment would come directly from the state, or indirectly through...state indemnification provisions.").  In constructing the lottery's authorizing statutory scheme as it did, the legislature evinced its intent to insulate the state from any liabilities that the NMLA may incur, and this factor weighs against finding arm of the state status.

    B.  Factors of Autonomy and Financial Independence

        1.  <u>Characterization of the NMLA under State Law</u>

Although determination of whether an entity is an arm of the state for Eleventh Amendment purposes is a question of federal law, the Court must determine the issue by looking to the provisions of state law that define the nature of the relationship between the entity and the state.  *See Duke*, 127 F.3d at 977 (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429-

430 n.5 (1997)). The inquiry should be a "formalistic survey of state law to determine whether the entity is identified as an agency of the state." *Steadfast Ins. Co. v. Grand River Dam Authority*, 507 F.3d 1250, 1253 (10th Cir. 2007). Looking at the NMLA's enabling legislation, it is hard to imagine that the legislature could have been much more explicit about its intent to create the NMLA as an agency independent of the state. In the article of the New Mexico Code that creates and regulates the lottery, the legislature stated its finding that "[t]he most desirable, efficient, and effective mechanism for operation of a state lottery is an independent lottery authority organized as a business enterprise separate from state government...." N.M.S.A. 1978 § 6-24-2(C) (1995). The legislative language actually creating the NMLA states that "[t]here is created a public body, politic and corporate, *separate and apart from the state*, constituting a governmental instrumentality to be known as the 'New Mexico lottery authority.'" N.M.S.A. 1978 § 6-24-5(A) (1995) (emphasis added). Thus, taking a "formalistic" view of the state law that defines the nature of the relationship between the NMLA and the state, this factor argues against finding arm of the state status.[3]

2. The Guidance and Control Exercised by the State over the NMLA

---

[3] This apparent legislative decision to create the NMLA as an entity separate from the state can be contrasted with the manner in which the lottery authorities of certain other states were structured so as to be an explicit arm of the state. For instance, the Massachusetts Lottery Commission was established as a division of the Massachusetts Treasury Department and the State Treasurer is, by law, the chairman of the Lottery Commission. *See Wojic v. Mass. State Lottery Comm'n*, 300 F.3d 92, 100 (1st Cir. 2002). Similarly, the New Jersey Lottery Commission was established as a division of the New Jersey Department of the Treasury, and any monetary judgment against the Lottery would be paid directly from the State treasury. *See Mitchell v. N.J. Lottery*, No. 04-cv-896, 2006 U.S. Dist. LEXIS 32559 at *29-30 (D. N.J. May 15, 2006). Both of these states' lottery commissions were established more than 20 years prior to the NMLA, so the New Mexico legislature had clear models to follow if it had chosen instead to make the NMLA a division of a state agency rather than an independent entity.

The legislature has provided the NMLA with considerable autonomy. The enabling legislation provided the Authority with "all powers necessary or convenient to carry out and effectuate the purposes and provisions of the New Mexico Lottery Act...and that are generally exercised by corporations engaged in entrepreneurial pursuits." N.M.S.A. 1978 § 6-24-6(A) (1995). In addition to this broad general provision, the legislation explicitly sets out powers reflective of an independent agency. These powers include the ability to adopt or amend rules and bylaws to conduct its affairs and business; to purchase insurance; to own, sell, or lease real and personal property; to hold copyrights, trademarks, and service marks and to enforce their rights with respect to them; and to enter into debt and borrow money in its own name. *Id*. The NMLA may sue and be sued in its own name and also has investigative powers such as issuing subpoenas and compelling attendance of witnesses at proceedings that it conducts. *Id*. It establishes its own rules regarding the payment of prizes, frequency of drawings, and sales of tickets. It may advertise, conduct market research, and establish a wide variety of promotions, all in an effort to fulfill its mandate to maximize revenue. It even sets the percentage of lottery revenues returned to the public in the form of lottery prizes (although it is required to return "as nearly as practical" at least fifty percent of gross annual revenues). N.M.S.A. 1978 §§ 6-24-8(B); 6-24-24(A) (1995).

As it is configured, the NMLA also exhibits some aspects of a state agency. For example, the members of its board of directors are appointed by the governor with the advice and consent of the state senate. N.M.S.A. 1978 § 6-24-5 (1995). This could conceivably operate as a check on the board's decision-making power, and it certainly counts as an indicator of guidance and control over the NMLA by the state. However, despite being named by the governor and confirmed by the senate, the board members appear to have a great deal of

autonomy. They serve five year terms and may be removed by the governor only for malfeasance, misfeasance, or willful neglect of duty, and then only after reasonable notice and a public hearing. *Id*. §§ (C), (D). Board members are not state employees, and, indeed, receive no compensation for their services.[4] *Id*. § (F). They select their own chairperson. *Id.* § (D). They are also responsible for hiring (and, if necessary, firing) a chief executive officer, setting his salary as well as the salaries of other officers and employees of the NMLA, and approving all major procurements. N.M.S.A. 1978 §§ 6-24-7(C), (F) (1995).

The state also maintains some level of oversight over the NMLA. The legislative finance committee is charged with "oversee[ing] the operations of the [NMLA], as well as periodically review[ing] and evaluat[ing] the success with which the authority is accomplishing its duties...." N.M.S.A. 1978 § 6-24-9 (1995). It has the authority to conduct an independent audit or investigation of the lottery or the NMLA and must report annually its findings on the lottery to the legislature. *Id*. The board must also submit quarterly and annual reports to the governor and the legislative finance committee disclosing lottery revenues, costs, and organizational structures. N.M.S.A. 1978 § 6-24-27 (1995). Finally, it must provide to the department of finance and the legislative finance committee, "for informational purposes," a copy of the following year's proposed operating budget and an estimate of the revenues to be deposited in

---

[4] In the same filing as their *Memorandum Brief in Opposition to Defendants' Motion to Dismiss Plaintiffs' Section 1983 Claims* [Doc. no. 52], Plaintiffs attached an "FAQ" from the lottery's website stating that lottery employees are not state employees. Because the Court is deciding a Motion to Dismiss or for Judgment on the Pleadings under Fed. R. Civ. P. 12 and not one for summary judgment under Rule 56, matters outside the pleadings are not properly before the Court. Therefore, the Court did not consider this attachment or any references thereto in reaching its decision.

the lottery tuition fund for the current and future years.  *Id*.

Nonetheless, the Court feels that this oversight is insufficient to override the numerous indicia of financial and managerial autonomy discussed above.  The board's stated duty is to "maximize the net revenue for the public purposes of the New Mexico Lottery Act and to that end assure that all rules, policies, and procedures adopted further revenue maximization." N.M.S.A. 1978 § 6-24-7 (1995).  In keeping with that goal, rather than having the lottery managed by state government bureaucrats, the legislature made an explicit choice to have it run by an independent board to "provide the [NMLA] with the private-sector perspective of a large marketing enterprise."  *Id*.   Importantly, this independent board has the authority to approve, disapprove, or modify the annual budget recommended by the CEO--it is not required to seek legislative approval of its budget.  *Id*.  The board must select, at its own expense, an independent certified public accounting firm to audit the lottery each year, and the results of the audit are given to the governor, speaker of the house, president of the senate, and legislative finance committee.  N.M.S.A. 1978 § 6-24-27(C) (1995).

The state's oversight appears to consist of little more than ensuring that the NMLA is operating in an honest, reasonable manner, and according to generally accepted accounting principles.  Similarly, the reports to the department of finance and the legislative finance committee that provide an estimate of revenues to be deposited in the lottery tuition fund simply enable those agencies to be able to better plan education budgets.  Such oversight, without more, does not indicate interference from the state or exercise of control over the day-to-day operation of the lottery.

Although the Court recognizes that the state exercises some degree of guidance, oversight, and control over the NMLA, on balance it appears that the legislature has provided the

NMLA with a sufficiently high level of autonomy to indicate a level of state involvement in the NMLA's day-to-day activities that is insufficient to confer Eleventh Amendment immunity upon it.

### 3. The Degree of State Funding Received

The legislature established the lottery as "a business enterprise separate from state government, without need for state revenues or resources...." N.M.S.A. 1978 § 6-24-2(C) (1995). As discussed previously in section A (addressing whether the state treasury would be liable for a judgment against the lottery), the lottery is designed to be self-sustaining and self-funded, and legislation prohibits the transfer of any state funds to pay the expenses of the NMLA. N.M.S.A. 1978 § 6-24-25 (1995). All of the lottery's operating funds come from ticket sales. The net revenues remaining after all prizes are paid and operating expenses are subtracted are transmitted to the state treasurer to be deposited in the lottery tuition fund. N.M.S.A. 1978 § 6-24-24 (1995). That the lottery's net revenues are apportioned to the state's coffers has no impact on the fact that the lottery has full control over the generation of those revenues through its autonomous operations and that it operates completely independently of state funding. This point, as well, argues against finding the lottery to be an arm of the state.[5]

### 4. The NMLA's ability to issue bonds and levy taxes

The legislature authorized the board of directors to issue revenue bonds worth up to three million dollars to provide funds for the lottery's initial development and operation. The

---

[5] Clearly, independence from state funding is not, by itself, a sufficient indicator that an entity is not an arm of the state. In *Steadfast Ins. Co. v. Grand River Dam Auth.*, 507 F.3d. 1250 (10th Cir. 2007) the court found the Grand River Dam Authority ("GDRA") to be an arm of the state despite the fact that it is self-funded through fees. However, the GDRA had significant indicia of being an arm of the state, including being legislatively described as a governmental agency of the state and being prohibited from acquiring or selling property.

bonds were payable solely from funds generated by the operation of the lottery. N.M.S.A. 1978 § 6-24-26 (1995). On the other hand, the NMLA lacks the authority to levy taxes. Of course, it has no need to levy taxes because it is completely self-sufficient. Nonetheless, the Tenth Circuit has said that the ability to levy taxes, an attribute of many political subdivisions, is relevant in determining whether an entity is an arm of the state. *See Sturdevant,* 218 F.3d at 1169. The *Sturdevant* court found that the Colorado State Board of Community Colleges' absence of taxing authority and the legislature's restrictions on its ability to issue bonds tipped the balance on this inquiry toward finding arm of the state status. *Id*. Because the NMLA's authority to issue revenue bonds for its initial financing gave it more freedom than the entity at issue in *Sturdevant*, but it does not have the authority to levy taxes, the Court finds this inquiry to be neutral.

    C. State vs. Local Focus

After setting out the factors to consider in an arm of the state analysis, the *Sturdevant* court noted that other circuits have considered other factors, including whether the entity is concerned more with local or statewide issues. *Id*. at 1165. The court went on to consider this factor later in its decision, as part of its analysis of state control. It also stated that part of the reason it was overturning the district court's finding that the Colorado State Board of Community Colleges was not an arm of the state was that "the district court gave insufficient weight to the Board's primary focus on state-wide issues...." *Id*. at 1169. According to the *Sturdevant* court, a focus on this factor is important because the fundamental question to be answered is whether the entity "is 'more like a county or city than...like an arm of the state.'" *Sturdevant*, 218 F.3d at 1164 (citation omitted). Additionally, one of the characteristics of a political subdivision, as opposed to an instrumentality of a state, is "political control by some community other than the state as a whole." *Id*. at 1169. Similarly, in *Steadfast Ins. Co. v.*

10

*Grand River Dam Auth.*, 507 F.3d. 1250, 1254 (10th Cir. 2007), the court's inquiry into whether the entity was concerned primarily with local or state affairs was a factor in its analysis.

While this factor may be important to the analysis of whether an entity is an arm of the state, it is clearly not dispositive. If it were, any entity that was not associated with a particular locality would automatically be considered an arm of the state, and no analysis of the primary *Sturdevant* factors would be necessary. This is not the approach that courts have taken in other arm of the state analyses involving state-wide entities, such as *Sturdevant* and *Steadfast*. In fact, courts do not always consider the state vs. local focus at all. In *United States ex rel. Sikkenga v. Regence Bluecross Blueshield*, 472 F.3d 702 (10th Cir. 2006), the court found that a laboratory entirely owned by the University of Utah was not an arm of the state. In making this finding, the court looked at the state's legal liability for a judgment, the degree of autonomy from the state, and the extent of independent financing the agency receives. It did not even discuss the state vs. local focus.[6] *Id* at 717. *See also Jornigan v. N.M. Mut. Cas. Co.*, No. 03-cv-813, 2004 U.S. Dist. LEXIS 28287 (D. N.M. July 14, 2004) (holding that the New Mexico Mutual Casualty Company was not an arm of the state despite being legislatively authorized, being run by "appointed public officials of the state," and operating statewide for the benefit of the entire state, without considering the state vs. local focus). In this case as well, even considering the state vs. local focus, the Court does not believe that the other indicia of the NMLA being an independent political subdivision are overcome.

D. Conclusion

---

[6] The opinion in *Sikkenga* was authored by the same judge who authored *Sturdevant*, indicating that the decision not to look at state vs. local factors was most likely a deliberate one rather than an oversight.

Although some factors weigh toward the NMLA being considered an arm of the state, overall the factors make the NMLA appear more like an independent political subdivision. The *Sikkenga* court recognized that when indicators of immunity go in two different directions, the Eleventh Amendment's reasons for being should be the court's primary guide in its analysis. *Sikkenga*, 472 F.3d at 721. It looked to the Supreme Court's decision in *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994), which it characterized as "recognizing the protection of state treasuries and dignity as sovereigns in our federal system as the Eleventh Amendment's twin reasons for being." *Id*. It went on to say that "[a]s in *Hess*, common sense and the rationale of the Eleventh Amendment do not require that sovereign immunity attach when an agency is structured to be self-sustaining and has a long history of paying its own way." *Id*. (citing *Hess*, 513 U.S. at 49-50). In this case, the NMLA was structured to be self-sustaining, it is self-funded, it is characterized by the legislature as independent of the state, and it appears to operate largely independently on a day-to day basis. Given these factors, the Court concludes that the NMLA is not an arm of the state, and that the agency and its officers are not immune from Plaintffs' § 1983 claims.

**IT IS THEREFORE ORDERED** that Defendants' *Motion to Dismiss or for Judgment on the Pleadings as to Plaintiffs' Section 1983 Claims* [Doc. no. 47] is DENIED.

                                                      JUDITH C. HERRERA
                                                      UNITED STATES DISTRICT JUDGE