## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ANTHONY LUCERO, KEN DAHLSTROM,**
**JOHN MINTER,** and **CLAUDIA ROMERO**

   **Plaintiffs,**

**v.**              **No. CIV 07-499 JCH/RLP**

**THE NEW MEXICO LOTTERY;**
**TOM ROMERO**, Individually and In His Official Capacity
As The Chief Executive Officer of the New Mexico Lottery;
**PAT BEARE**, Individually and In His Official Capacity
As The Director of Sales of the New Mexico Lottery; and
**Evelyn MCKNIGHT** Individually and In Her Official Capacity
As The Director of Human Resources of the New Mexico Lottery**;**

   **Defendants.**

## MEMORANDUM OPINION AND ORDER

   THIS MATTER comes before the Court on Plaintiffs' *Motion for Summary Judgment Concerning Property Interest Claim* [Doc. 82] and Defendants' *Motion for Summary Judgment on the Claims brought by Plaintiff Ken Dahlstrom* [Doc. 92], *Motion for Summary Judgment on the Claims brought by Plaintiff Anthony Lucero* [Doc. 93], *Motion for Summary Judgment on the Claims brought by Plaintiff John Minter* [Doc. 94], and *Motion for Summary Judgment on the Claims brought by Plaintiff Claudia Romero* [Doc. 95].  The Court having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that Plaintiffs' motion is not well taken and should be DENIED, and that Defendants' motions on the claims brought by each of the Plaintiffs are well taken and should be GRANTED.

## BACKGROUND

Plaintiffs are four former employees of the New Mexico Lottery Authority ("the Lottery").  As of March 2007, each Plaintiff had been employed by the Lottery as a Lottery Sales Representative ("LSR") for over eleven years.  LSRs each cover a particular sales territory, providing service to Lottery retailers.  On April 2, 2007, Plaintiff Anthony Lucero was laid off from his position.  On April 13, 2007, Plaintiffs Ken Dahlstrom and Jack Minter submitted their letters of resignation to the Lottery.  On April 20, 2007, Plaintiff Claudia Romero submitted her letter of resignation to the Lottery.  Plaintiffs contend that they had a property interest in continued employment, which they could not be deprived of without due process of law. Plaintiff Lucero claims that his layoff was, in fact, an artifice undertaken by the Lottery so that they would not have to provide him with due process prior to termination.  The remaining Plaintiffs claim that they were deprived of their property interest in continued employment by being constructively discharged, in that the Lottery made their working conditions so difficult that they had no choice but to resign.  Plaintiffs claim that the Lottery took adverse action against them because they engaged in activity protected by the First Amendment.

The claims brought by Plaintiffs are: (1) deprivation of property without due process of law pursuant to 42 U.S.C. § 1983; (2) breach of employment contract under New Mexico law; (3) violation of First Amendment right to free speech pursuant to 42 U.S.C. § 1983; and (4) common law retaliatory discharge.  Plaintiffs have now collectively dropped all claims against Defendant McKnight.  *See Plaintiff's Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment on the Claims Brought by Ken Dahlstrom* [Doc. 104] at 24 (hereinafter

"Dahlstrom Resp.")].[1]   In addition, Plaintiffs Dahlstrom, Minter, and Romero have now dropped claims that Defendant Beare retaliated against them for exercising their First Amendment rights. *See id*.   Their due process and breach of contract claims against Beare remain.   Plaintiff Lucero maintains his First Amendment retaliation claims against Defendant Beare only as they relate to Lucero's sending of an email on March 16, 2007, as discussed further below.   *See Plaintiff's Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment on the Claims Brought by Anthony Lucero* [Doc. 105] at 13 (hereinafter "Lucero Resp.").

Plaintiffs' suit has its genesis in an earlier suit filed by another former Lottery employee, Gary Lewis ("Lewis").   Lewis worked as an LSR until May 2004, when he was terminated, allegedly for giving an unauthorized newspaper interview in which he criticized certain Lottery practices relating to the distribution of scratch-off tickets to smaller retailers and the picking up of unsold scratch-off tickets while substantial prizes were still outstanding.   After his termination, Lewis sued the Lottery and its former CEO, Tom Shaheen, claiming that he was fired for engaging in protected speech.   Lewis identified Plaintiffs Dahlstrom, Lucero, and Claudia Romero as potential witnesses on his behalf in his Initial Pretrial Report, filed in January, 2006.   At the request of Defendant Romero, the Lottery's CEO, Plaintiffs Dahlstrom, Lucero, and Claudia Romero, as well as LSR Trevas Younger, met at Lottery headquarters on August 10, 2006 with Mary Jenke, the Lottery's retained counsel.   The purpose of the meeting was to discuss their expected testimony in the Lewis case.   Plaintiffs claim that, during that

---

[1] Plaintiffs and Defendants have briefed each of the motions for summary judgment relating to each Plaintiff, but, as Plaintiffs' claims are very similar, the briefs generally cover the same territory.   To avoid excessive citations, unless differing circumstances dictate discussion of citation to briefs relating to another Plaintiff, this opinion will discuss and cite to the briefs related to Dahlstrom, which are the most complete.

conversation, Plaintiffs Dahlstrom, Lucero, and Claudia Romero, as well as Trevas Younger, informed Ms. Jenke that they were planning to testify on Lewis's behalf, and that Lewis's attorney had requested that they each sign an affidavit backing his claims. Plaintiffs also claim that, although Plaintiff Minter did not meet with Ms. Jenke that day, Dahlstrom told her that Minter had agreed to be a witness on behalf of Lewis, and was planning to execute an affidavit. Plaintiffs executed their affidavits in support of Lewis between August 15-18, 2006, and mailed the affidavits to Lewis's attorney. At a settlement conference on October 5, 2006, the Lewis case settled pursuant to undisclosed terms.

Plaintiffs contend that, within days of their meeting with the Lottery's attorney in which they revealed that they would be testifying in favor of Lewis, the Lottery began to engage in a pattern of retaliation against them that culminated in April of 2007 with the constructive discharge of Dahlstrom, Minter, and Claudia Romero, and the layoff of Lucero. They allege that, on August 18, 2006, Defendant Romero promoted two other LSRs with less seniority than Plaintiffs to the newly created positions of Field Supervisor without holding an open competition for the positions. In December 2006, Plaintiffs and other Lottery employees were informed that the Lottery had revised its Leave Policy to be less generous than in the past. Later that month, Defendant Romero informed Plaintiffs and other Lottery employees that it would no longer provide quarterly sales bonuses to its LSRs. On February 7, 2007, Las Cruces LSR Trevas Younger resigned, effective February 20. Later in February, and again in April, most LSRs, including Plaintiffs, had their number of accounts and the geographical range of their routes considerably expanded. Following the April expansion of their routes, Plaintiffs Dahlstrom, Minter, and Claudia Romero resigned, claiming that their working conditions had become so

intolerable that any reasonable person would be forced to resign.

On April 2, 2007, Lucero, LSR Glenda Bixler, and staff auditor John Gentry were laid off.  In a claim separate from the other Plaintiffs, Lucero claims that he was laid off not only in retaliation for his support of Lewis, but also because of an internal email that he sent to Lottery officials, including Defendant Beare, on March 16, 2007.  The email expressed his objection to what he believed was the Lottery's policy to order LSRs to pick up from retailers games that still had top prizes available to be won.

It is undisputed that the context in which all of the events at issue took place was one in which the Lottery faced an upcoming severe budget shortfall.  Historically, the Lottery had returned approximately 24% of its gross revenues to the Lottery Scholarship Fund.  In August 2006, the same month that Defendant Romero assumed the role of Lottery CEO (moving from the position of interim CEO), a New Mexico public policy group published a report recommending that the Lottery cut operating and administrative costs and that the Legislature require the Lottery to provide 30% of its gross revenues to the Scholarship Fund.  Recognizing that legislation of the type recommended would probably be passed, and that such legislation would require the Lottery to cut operating expenses by millions of dollars, Defendant Romero instructed his staff to find ways to cut costs and expenses, including by looking at staffing levels.  Defendants contend that the layoffs of Lucero and other Lottery employees, as well as the increased workloads of the other Plaintiffs and their fellow LSRs were a result of restructuring due to budget constraints, while Plaintiffs claim that the Lottery merely used budget cuts as a pretext to get rid of them.

5

**DISCUSSION**

A.  Plaintiffs' Property Interest Claim

Plaintiffs Dahlstrom, Minter, and Claudia Romero contend that the Lottery wished to terminate their employment, but lacked a valid cause for their termination.  As a result, they claim, the Lottery's CEO set about on a course of conduct to make their working conditions so intolerable that they would be forced to resign.  Lucero contends that the Lottery also decided to terminate his employment without just cause and did not want to provide him with due process, so they laid him off and used the elimination of his position as a pretext for his termination.

A government employee may pursue an action under 42 U.S.C. § 1983 for discharge without due process, including in instances of constructive discharge, if the employee possessed a protected property or liberty interest in his employment.  *See Lighton v. Univ. of Utah*, 209 F.3d 1213, 1221 (10th Cir. 2000).  A property interest in the employment context consists of "a legitimate expectation in continued employment."  *Lenz v. Dewey*, 64 F.3d 547, 551 (10th Cir. 1995) (*citing Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  Plaintiffs claim that they had a protected property interest in their employment by virtue of their longevity in their positions and because of a Progressive Discipline Policy adopted (and later repealed) by the Lottery.  The Court determines whether such a property interest exists by looking at state law.  *See Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996).  After reviewing Plaintiffs' claims, New Mexico law, and the undisputed material facts, the Court concludes that Plaintiffs had no protected property interest in their continued employment with the Lottery.

1.  Longevity of Employment

Plaintiffs each worked for the Lottery for eleven years prior to their termination or

6

resignation.  In their brief supporting their motion for summary judgment on their property interest claim [Doc. 83], Plaintiffs cite *Lovato v. City of Albuquerque*, 106 N.M. 287 (1987), for their contention that longevity alone can create an expectation of continued employment that amounts to a property interest, regardless of the terms of a governing employment manual.  This contention misrepresents *Lovato* and significantly overstates its reach.

The plaintiff in *Lovato* had been a "classified" city employee in various positions for twenty-seven years.  The court, referring to a City of Albuquerque ordinance and associated personnel rules, defined a "classified" employee as "one who is permanently employed by the City and entitled to all rights and benefits guaranteed by the merit system, one of which is recourse to the grievance procedure."  *Lovato*, 106 N.M. at 288.  When the plaintiff was removed from a "temporary" assignment that he had held for thirteen years, resulting in a reduction in pay, he filed a grievance.  The City denied his right to file a grievance because its personnel rules specifically exempted from the grievance procedures a situation in which a person is removed from a temporary assignment and reassigned to another position.  In upholding the plaintiff's right to a hearing before the City's personnel board, the New Mexico Supreme Court concluded that "after a thirteen year employment in his assignment position, [plaintiff's] employment at the position, grade, and pay rate prior to the transfer could not be considered a temporary, discretionary advancement within the meaning of the merit system and personnel rules."  *Id.* at 290.  Significantly, the court observed that "[t]he sufficiency of any claim of entitlement must be decided by reference to the independent source of rules or understandings that secure the benefit."  *Id.*  The holding in *Lovato* is based solely on the ordinances and policies of the City of Albuquerque, none of which is relevant in this case, and appears limited to the proposition that

an employee who serves in a position for thirteen years and who would otherwise be guaranteed a grievance procedure cannot be denied that procedure simply because his employer labels the position as "temporary."  It does not stand for the broad proposition that merely being a long-term employee is sufficient to create a property interest in continued employment, nor does it appear that any court has ever cited *Lovato* for such a proposition in the more than two decades since it was decided.  Thus, Plaintiffs' reliance on *Lovato* to demonstrate a property interest in continued employment fails.

2.  <u>The Positive Discipline Policy</u>

In August of 1998, the Lottery distributed to all of its employees an updated set of employee policies to be included in their Employee Policy Manuals.  The new policies included the New Mexico Lottery Positive Discipline Policy ("PDP").  The PDP listed the progressive steps that the Lottery would generally take if an employee was subjected to discipline.  It also identified certain violations of Lottery policies that were so egregious that the employee would not receive progressive discipline under the policy.  In those instances where the employee received progressive discipline, the PDP stated that it consisted of the following steps: (1) oral reminder; (2) written reminder; (3) decision making leave; and (4) termination.  The policy explicitly stated that "the steps will generally be taken in the order listed," but that "any and all of the first 3 steps may be omitted, at the sole discretion of [the Lottery]." *See* Positive Discipline Policy, attached as Ex. 5 to Plaintiffs' Motion for Summary Judgment [Doc. 83].  The Lottery Board of Directors repealed the PDP on March 14, 2002, more than five years prior to the employment actions at issue in this case.

Under New Mexico law, employment without a definite term is presumed to be at-will.

8

*See Trujillo v. N. Rio Arriba Elec. Co-op, Inc.*, 131 N.M. 607, 615 (2001); *Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 672 (1993).  In an at-will employment situation, either the employer or the employee generally has the right to terminate the employment relationship at any time and for any reason.  *See Melnick v. State Farm Mut. Auto. Ins. Co.*, 106 N.M. 726, 730 (1988).  New Mexico courts have recognized two exceptions to the at-will employment rule: (1) unlawful retaliatory discharge; and (2) "where the facts disclose the existence of an implied employment contract provision that limits the employer's authority to discharge."  *Lopez v. Kline*, 124 N.M. 539, 541 (1997).

Plaintiffs' property interest claims appear to rely on the "contract provision that limits the employer's authority to discharge" exception mentioned in *Lopez*.  Plaintiffs correctly note that a representation in an employee handbook may contractually modify the at-will presumption if the employer indicates that termination will be only for just cause or establishes mandatory pre-termination procedures that include probationary periods, warnings for proscribed conduct, or grievance procedures.  *See Hartbarger*, 115 N.M. at 668.  In addition, the Tenth Circuit has recognized that a public employee who cannot be terminated except for cause has a recognized property interest in continued employment.  *See Ewers v. Bd. of County Comm'rs of the County of Curry*, 874 F.2d 736, 738 (10th Cir. 1989); *Bailey v. Kirk*, 777 F.2d 567, 574 (10th Cir. 1985).

However, to reach the level of creating a contractual right, the terms of the employer's representation must be sufficiently explicit to create a reasonable expectation of an implied contract.  *See Trujillo*, 131 N.M. at 616; *Garrity v. Overland Sheepskin Co.*, 121 N.M. 710, 713 (1996); *Hartbarger*, 115 N.M. at 669.  An employee's expectations of an implied contract "must satisfy a certain threshold of objectivity" before they can be considered "reasonable."

*Keidrowski v. Citizens Bank*, 119 N.M. 572, 575 (Ct. App. 1995). *See also Hartbarger,* 115

N.M. at 672 (holding that because employee's expectations regarding creation of an implied

contract were not objectively reasonable, employer was entitled to judgment as a matter of law).

 The Court finds that the Lottery's PDP was not sufficiently explicit to create an

objectively reasonable expectation of an implied contract. Most importantly, the PDP did not

impose binding limitations on the Lottery's right to terminate employees, nor did it set forth

absolute circumstances under which discipline would or would not be administered. It simply

outlined a general approach for handling personnel issues. The policy explicitly stated that any

and all of the steps leading to termination could be omitted at the Lottery's sole discretion. Such

limiting language served to make clear that the steps were not established procedures that

governed the employment relationship. Nowhere in the policy did the Lottery state that

employees could only be terminated for sufficient cause or that an employee was guaranteed

each step in the progressive discipline policy.

 The Lottery's Director of Human Resources, Evelyn McKnight, confirmed in her

deposition that the PDP was merely a guideline and that supervisors had the discretion to choose

to follow it or not. *See* Defendants' Response to Plaintiffs' Motion for Summary Judgment

[Doc. 101], Ex. A at 39-40. In this manner, the PDP was significantly different from those

policies in other cases in which courts found the employer's representations to be sufficiently

explicit to alter the at-will employment presumption. *See, e.g., Ewers*, 874 F.2d at 739 (at-will

employment assumption overcome when employee handbook explicitly promised that

employees could not be discharged without cause unless their position was abolished); *Bailey*,

777 F.2d at 574 (property interest in continued employment when manual explicitly stated that

an employee could only be suspended or terminated for cause and when discipline policy

included mandatory language); *Kiedrowski*, 119 N.M. at 575 (implied contract found when

employee handbook contained mandatory progressive discipline procedures combined with

testimony that managers were required to follow the procedures outlined in the handbook);

*McGinnis v. Honeywell*, 110 N.M. 1, 6 (1990) (sufficient evidence to find a contract where

evidence was presented that company's policy was to take uniform and consistent actions

regarding termination, supervisors were required to follow written policies, and company

followed its written policies to the letter).

The PDP appears much closer to policies that were found not to have created implied

contracts.  For instance, in *Trujillo*, the court found that the company's written personnel policy

did not create a reasonable expectation of an implied contract in a situation where management

explicitly retained the right to impose sanctions, including discharge, for work performance

deemed unacceptable by management.  Rather than finding that this policy limited management

to terminating employees only for cause, the court held that no contract was created because

management retained the sole discretion to choose which disciplinary sanctions to impose and

the manual plainly stated that disciplinary sanctions "may or may not be progressive in terms of

one sanction preceding or following another."  131 N.M. at 616.  Similarly, in *Garrity*, the court

held that a written personnel policy that expressly reserved the company's right to terminate an

employee for any reason could not create any reasonable expectation of an implied contract.[2]

_____

[2] In addition to language in the PDP reserving to the Lottery's sole discretion the decision
of whether to follow the steps in the policy, the cover sheet to the PDP contains language
specifying that "the employment relationship at any time, for any reason can be terminated with
or without cause...and with or without warning or notice, at any time by [the Lottery]."  *See*
Positive Discipline Policy, attached as Ex. 5 to Plaintiffs' Motion for Summary Judgment [Doc.

121 N.M. at 714.  Finally, in *Sanchez v. The New Mexican*, 106 N.M. 76, 79 (1987), the court held that an employee handbook did not constitute an implied contract despite terms stating that "the employer will attempt to give an employee who is in danger of discharge 'repeated warnings,'" and "the employer will fire an employee without having given such warnings only 'for cause.'"  *Id*. at 78.  The court found that "the handbook lacked specific contractual terms which might evidence the intent to form a contract" and that the handbook's language was "of a non-promissory nature and merely a declaration of defendant's general approach to the subject matter discussed."  *Id*. at 79.  Thus, following the *Sanchez* court's reasoning, even if the language of the PDP indicated that an employee would only be terminated for cause, it still did not create an implied contract because it did not contain promissory language and was merely a declaration of the Lottery's general approach to discipline.

In addition, Plaintiffs signed numerous acknowledgment forms, specifically agreeing that they were at-will employees and that nothing in the employee handbook should be construed as a contract.  Plaintiffs signed these forms prior to the time the PDP was adopted, at the time the PDP was adopted, after the PDP was adopted, and after the PDP was repealed.  For instance, the Employment Application, which each Plaintiff signed, clearly stated "I understand that my employment can be terminated, with or without cause, at the option of either the [Lottery] or [myself], and with or without warning or notice, at any time by [the Lottery]."  *See* Defendants' Motion for Summary Judgment on the Claims brought by Plaintiff Ken Dahlstrom [Doc. 92], (hereinafter "Dahlstrom MSJ") at 3-4 (UMF 3).[3]  Upon employment, Plaintiffs received a copy

---

83].

[3] "UMF" refers to Undisputed Material Fact.

of the Lottery Employee Policy Manual, along with an acknowledgment form that Plaintiffs signed, which stated "[n]othing in this handbook should be interpreted as a contract of employment of any kind.  The policies contained within the handbook are provided for guidance purposes only...I understand that employment at the New Mexico Lottery is at-will at all times." *Id.* at 4 (UMF 4).  The PDP was distributed as an insert to the Employee Policy Manual along with an acknowledgment form that stated: "I further acknowledge that neither this Employee Policy Manual, nor this acknowledgment alters the at will nature of my employment with [the Lottery] and none of the provisions in the policy manual create or are intended to create an employment contract or any part of an employment contract, either express or implied with the [Lottery]."  *Id*. at 5-6 (UMF 12).  On at least twenty other occasions following the adoption of the PDP, as new policies were added to the Employee Policy Manual, Plaintiffs signed acknowledgment forms indicating their understanding that the material contained in the manual should not be interpreted as an employment contract of any kind and that employment with the Lottery was at-will and could be terminated at any time for any reason.  *See id*. at 6-9 (UMFs 14, 16, 19, 20, 22, 23, 24, and 26).[4]

The existence of a signed disclaimer is not sufficient, by itself, to defeat a claim of an

---

[4] In October 2006, the Lottery Board adopted a Professional Standards Policy and distributed the policy along with an acknowledgment form to each Lottery employee.  Plaintiffs refused to sign the acknowledgment form because, for the first time in the history of their employment with the lottery, they claimed to object to the at-will employee language.  The Lottery put the form in Plaintiffs' files stating that the Policy had been reviewed with them, but that they refused to sign.  Plaintiffs were not disciplined for refusing to sign the Acknowledgment form.  *See* Dahlstrom MSJ [Doc. 92] at 10 (UMF 28-32).  Initially, Plaintiffs claimed that their layoff/constructive discharge was due in part to retaliation for their refusal to sign the acknowledgment form.  They have now dropped  that claim.  *See* Dahlstrom Resp. [Doc. 104] at 10 n.2.

13

implied contract, because "an implied contract can still exist in spite of a disclaimer, where the employer's conduct reasonably leads employees to believe that they will not be terminated without just cause and a fair procedure." *Kiedrowski*, 119 N.M. at 575.  However, the Court must consider the totality of the relationship between the employer and employees and the circumstances surrounding the issuance of the policy to determine whether the employee's expectations were reasonable. *Zacardi v. Zale Corp.*, 856 F.2d 1473, 1476 (10th Cir. 1988); *Hartbarger*, 115 N.M. at 672-673.  For this reason, the existence of so many signed disclaimers is relevant.  In addition to the non-promissory language of the policy, the numerous signed disclaimers serve to further demonstrate that any reliance on the PDP as creating an implied contract is not objectively reasonable.  The Court therefore holds that Plaintiffs had no property interest in continued employment with the Lottery.[5]

B.  Plaintiffs' First Amendment and Retaliatory Discharge Claims

All four Plaintiffs claim that they were retaliated against for executing affidavits in support of their former co-worker's retaliatory discharge lawsuit against the Lottery.  In addition, Plaintiff Lucero claims that he was retaliated against for sending an internal email on March 16, 2007 that expressed his concerns about Lottery policies.  Boiled down to its essence, Plaintiffs' claim is that, in retaliation for their speech, the Lottery abolished bonuses for *all* employees, revised the leave policy for *all* employees, created the new position of Field Representative in

_____

[5] Although the Lottery Board repealed the PDP in March 2002, more than five years before the employment actions at issue in this case, Plaintiffs argue that its unilateral repeal was not valid.  They assert that, once a property interest is bestowed by the state, the recipient cannot be deprived of that interest without procedural safeguards, citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  Because the Court has determined that the Lottery did not bestow a property interest in employment through its issuance of the PDP, it need not address the question of whether the Lottery could unilaterally revoke the PDP.

order to promote two LSRs who had not signed affidavits, substantially increased the sales

territories for *all* employees, and laid off two employees in addition to Plaintiff Lucero.

Plaintiffs contend that the Lottery did all of this substantially because of Plaintiffs' speech, rather

than due to an admitted need to reduce operating costs by approximately $6 million.

The Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), sets forth the

current test for analyzing First Amendment retaliation claims.  As discussed in *Brammer-Hoelter*

*v. Twin Peaks Charter Acad.*, 492 F. 3d 1192, 1202-03 (10th Cir. 2007)*,* after *Garcetti*, a First

Amendment retaliation analysis consists of five prongs: (1) The court must first determine

whether the employee was speaking pursuant to his official duties; (2) if it is determined that the

employee was speaking as a citizen rather than pursuant to his official duties, the court must then

determine whether the subject of the speech is a matter of public concern; (3) if the employee

was speaking as a citizen about a matter of public concern, the court must determine "whether

the employee's interest in commenting on the issue outweighs the interest of the state as

employer"; (4) if the employee's interest outweighs that of the employer, the employee must

demonstrate that the speech was a "substantial factor or a motivating factor in [a] detrimental

employment action"; and (5) if the employee is able to demonstrate that his speech was a

substantial motivating factor in an adverse employment action, "the employer may demonstrate

that it would have taken the same action against the employee even in the absence of the

protected speech."  The first three prongs present questions of law.  The fourth and fifth prongs

of the analysis address causation and generally present questions of fact to be evaluated subject

to the preponderance of the evidence.  *See Baca v. Sklar*, 398 F.3d 1210, 1219 (10th Cir. 2005).

Although the fourth and fifth factors are normally fact questions for a jury, summary judgment is

appropriate if facts relevant to the claim are not materially in dispute. *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1155 (10th Cir. 2005) (affirming summary judgment on First Amendment retaliation claim where evidence was insufficient to demonstrate genuine issue of material fact on fifth prong); *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005) (upholding summary judgment on First Amendment retaliation claim where evidence was insufficient to demonstrate genuine issue of material fact on fourth prong).[6]

### 1. Was Speech Made Pursuant to Official Duties?

Under the first prong of the *Garcetti* analysis, the Court must initially determine whether Plaintiffs engaged in incidents of speech pursuant to their official duties. The Tenth Circuit has defined this test as follows: if a public employee "engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties" and is not protected by the First Amendment. *Brammer-Hoelter*, 492 F.3d at 1203. Plaintiffs' primary responsibilities were calling on Lottery retailers and marketing Lottery materials. Defendants do not contend, nor does the Court find, that either the affidavits in the *Lewis* case or Lucero's March 16, 2007 internal email were speech made pursuant to Plaintiffs' official duties at the Lottery. Thus, the Court must move on to evaluate whether the speech was on a matter of public concern.

### 2. Was Speech on a Matter of Public Concern?

---

[6] Because *Garcetti* added an initial prong to the previous framework for analyzing free speech claims, those cases decided before *Garcetti* referred to the current fourth prong as the "third prong," and the current fifth prong as the "fourth prong," but the analysis of the prongs remains unchanged.

In deciding whether speech implicates a matter of public concern, courts consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Speech involves a matter of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community. *See Witham v. Baptist Health Care of Okla., Inc.*, 98 F.3d 581, 583 (10th Cir. 1996) (*citing Connick*, 461 U.S. at 146). Speech pertaining to internal personnel disputes, however, ordinarily does not involve matters of public concern. *See Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996). In assessing speech, courts examine whether it "disclose[d] any evidence of corruption, impropriety, or other malfeasance on the part of [government] officials." *Dill v. City of Edmond*, 155 F.3d 1193, 1202 (10th Cir. 1998). Also, in considering the context of the speech, the Court determines whether it could be considered to have "raised...concerns in a manner reasonably calculated to compel...compliance with the law." *Baca*, 398 F.3d at 1220. The Court must also consider whether, given its content and context, the speech "sufficiently inform[s] the issue as to be helpful to the public in evaluating the conduct of the government." *Wilson v. Littleton*, 732 F.2d 765, 768 (10th Cir. 1984).

Turning first to Plaintiffs' affidavits in the *Lewis* case, Plaintiffs contend that they were speaking on a matter of public concern because they "were questioning the honesty and integrity of the [Lottery] and its conduct toward smaller retailers." Dahlstrom Resp. [Doc. 104] at 11. However, a close reading reveals that the affidavits do not actually allege that the Lottery violated the law or engaged in misconduct against retailers or the public. The affidavits simply state their understanding that Lewis lost his job with the Lottery because he gave a newspaper interview that was critical of Lottery practices, that smaller retailers were prevented by the

17

Lottery from carrying as many games as larger retailers and were likely losing business because of it, and that when certain games were closed, the game information available to the public at Lottery retail terminals would often show substantial unclaimed prizes, leading to questions from players or clerks as to why games were being closed when prizes appeared to remain.  In addition, the affidavits state Plaintiffs' awareness of Lewis's "concerns that the inventory control practices were not fair to the people in rural areas whose access to games was limited and put the smaller retailers at a competitive disadvantage," and state that "many of us shared those concerns about the fairness of the inventory practices because of complaints by retailers in our sales areas."  Dahlstrom MSJ [Doc. 92], Ex. U.

Plaintiffs submitted the affidavits to support their former colleague in his wrongful termination suit, not to report wrongdoing.  Plaintiffs did not share the affidavits with anyone other than Lewis's attorney, such as the media or any government officials.  As such, the affidavits appear closer to speech pertaining to "internal personnel disputes," *Gardetto*, 100 F.3d at 812, rather than speech raising "concerns in a manner reasonably calculated to compel...compliance with the law." *Baca*, 398 F.3d at 1220.  In addition, the affidavits simply questioned the "fairness," rather than the legality, of the Lottery's business decision to limit the number of games available at one time in stores that sold a lower volume of tickets.  Regardless of how Plaintiffs phrased it, statements that the Lottery does not permit all retailers to sell all games and that residents of rural areas may not be able to purchase all games at their local retailer, or that customers and retailers have questioned LSRs about why games are being ended, do not constitute any evidence of corruption, impropriety, or other malfeasance on the part of [government] officials." *Dill*, 155 F.3d at 1202.  As such, the Court finds that the affidavits for

18

which Plaintiffs claim they were retaliated against do not constitute speech on a matter of public concern.

Plaintiff Lucero's March 16, 2007 internal email, on the other hand, could be seen as addressing a matter of public concern. On March 15, 2007, the LSRs received an email from the Lottery's Products Manager adding three holiday games ("Christmas Club," "Holiday Countdown," and "$100,000 Winter Winnings") to the list of games being phased out. The email said that all outstanding tickets were due to the warehouse by April 16, 2007. In response to this email, Lucero wrote an email addressed to the Products Manager, all LSRs, the Field Supervisors, Defendant Beare (Director of Sales), and at least five other Lottery employees, although not Defendant Romero. The email stated Lucero's belief that many of the games being picked up still had top prizes available, that retailers were under the impression that closed-out games no longer have prizes available, that he does not see how this could not be construed as defrauding retailers and players, and that "this is very wrong and uncomfortable, possibly illegal." *Defendants' Motion for Summary Judgment on the Claims brought by Plaintiff Anthony Lucero* [Doc. 93] (hereinafter "Lucero MSJ"), Ex. E. On March 20, Defendant Romero sent a letter to all Lottery staff explaining the process used by the Lottery to decide when to end and pick up games and clarifying several misconceptions from Plaintiff Lucero's email. Because Lucero's email contained detailed information on Lottery practices that he believed could be illegal and the information was disseminated in a manner that could lead to compliance with the law, even if the information was erroneous, the Court finds that the email was speech on a matter of public concern. The fact that the email was internal, rather than public, does not prevent it from receiving First Amendment protection. *See Garcetti*, 547 U.S. at 420-21.

3. <u>Did the Employee's Interest Outweigh the Interest of the State?</u>

The third prong requires the Court to balance the interests of the employee in making the statements at issue against the interests of the state, as an employer, in promoting workplace efficiency.  In performing the balancing, the statements should "not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 389 (1987).  The Supreme Court has "recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.*  The Court finds that, if the affidavits were considered to be speech on a matter of public concern, the Plaintiffs' interest in executing the affidavits outweighed the Lottery's interest promoting workplace efficiency.  *See Melton v. City of Oklahoma City*, 879 F.2d 706, 713 (10th Cir. 1989) (under balancing test, court found that the plaintiff's "interest in testifying truthfully at trial easily outweighs the City's interest in preventing the testimony in order to preserve the efficiency and effectiveness of the police department").  Defendants have not alleged that Plaintiffs' execution of affidavits affected the ability of other Lottery staff to do their jobs, or that it caused a significant disruption.  Similarly, with respect to Plaintiff Lucero's email, Defendants have not contended that the email caused any type of disruption within the Lottery, nor have they attempted to assert any sort of justification that would outweigh Plaintiff Lucero's right to speak out concerning his beliefs about fraud and illegality within the Lottery.  Consequently, the Court finds that Plaintiff Lucero's interest in raising his concerns also outweighs any legitimate interest of the Lottery in

keeping him quiet.

### 4. Did Speech Play a Substantial Role in a Detrimental Employment Action?

Under the fourth prong of the *Garcetti* analysis, Plaintiffs have the initial burden to establish causation, in other words "to show the exercise of constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment." *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005). To withstand summary judgment at this step, therefore, Plaintiffs must produce evidence linking Defendants' actions to Plaintiffs' speech. *See id.*; *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994), overruled in part on other grounds by *Ellis v. Univ. of Kansas Med. Ctr.*, 163 F.3d 1186, 1194-98 (10th Cir. 1999). Although the Court views the evidence and draws all inferences in the light most favorable to the party opposing summary judgment, that party still "must identify sufficient evidence which would require submission of the case to a jury." *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992). The question for the Court on summary judgment is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). "Plaintiffs seeking to overcome a motion for summary judgment may not rest on mere allegations in their complaint but must set forth specific facts showing that there is a genuine issue for trial." *Trevizo v. Adams*, 455 F.3d 1155, 1159 (10th Cir. 2006). Fatally for Plaintiffs' claims, "[s]peculation or hunches admidst rumor and innuendo will not suffice." *Maestas*, 416 F.3d at 1189.

Even if Plaintiffs' affidavits could be considered protected speech on a matter of public

concern, they have failed to present sufficient facts showing that there is a genuine material issue for trial concerning causation.  Similarly, Plaintiff Lucero has failed to provide evidence that his email was a substantial motivating factor behind his layoff.

    <u>Defendant Romero's Knowledge of the Affidavits</u>

    Because Defendant Romero is the only Defendant against whom retaliation claims are pending, if he did not know about the affidavits, they could not have been the cause of any adverse employment action, and Plaintiffs' claims related to the affidavits would fail.  Defendant Romero stated in his deposition that he did not recall seeing the *Lewis* affidavits prior to this suit and that he was not aware of Plaintiffs' support for Lewis at the time they filed the affidavits in August.  *See* Dahlstrom MSJ [Doc. 92], Ex. H at 67, 73.  However, Plaintiffs have come forward with facts that, viewed in the light most favorable to them, could enable a reasonable factfinder to infer that Mr. Romero was aware of Plaintiff's support for Lewis at least by October, 2006, and possibly in August, 2006.  It is undisputed that, at the request of the Lottery's attorney, Defendant Romero instructed Plaintiffs Dahlstrom, Lucero, and Claudia Romero to meet with the Lottery's attorney on August 10 at Lottery headquarters to discuss their expected testimony in the Lewis case.  It is also undisputed that, during that conversation, each of the Plaintiffs informed the Lottery's attorney that they planned to testify on behalf of Lewis and that Lewis's attorney had requested that they sign affidavits supporting him.  Nor is it disputed that Plaintiffs informed the Lottery's attorney during this meeting that Plaintiff Minter would also be supporting Lewis in his suit and signing an affidavit.  On August 23, 2006, Lewis filed a brief in opposition to the Lottery's motion for summary judgment in that case, which relied on and cited extensively the affidavits of Dahlstrom, Lucero, and Minter.  Finally, Defendant Romero

attended the settlement conference for the Lewis case on October 5, 2006, at which time the case settled.  Based on Defendant Romero's deposition testimony, at this settlement conference, he was aware that at least one LSR had signed an affidavit supporting Lewis, (he believed it was Plaintiff Claudia Romero, but could not be sure) and that other LSRs were supporting Lewis in his suit, but he testified that he was not sure how many others or who they were.  *See* Dahlstrom MSJ [Doc. 92], Ex. H at 68-71.  Based on these facts, viewed in the light most favorable to the Plaintiffs, a factfinder could reasonably infer that Defendant Romero, as CEO of the Lottery, had discussed the case with the Lottery's attorney and  had knowledge that Plaintiffs were assisting Lewis in his suit, perhaps as early as August 10.

<u>Creation of the Field Supervisor Positions</u>

However, regardless of whether Defendant Romero knew in August or at any other time prior to the initiation of this suit that Plaintiffs had supported Lewis and had filed affidavits on his behalf is ultimately not material, because Plaintiffs have failed to meet the burden that they bear under this prong of establishing an adverse employment action directed at them.  *Maestas*, 416 F.3d at 1188 n.5.

Plaintiffs claim that the first act of retaliation against them was the promotion of two other LSRs, Scott Ward and Yvette Quintana, to the "newly-created" position of Field Supervisor, "without so much as a word concerning whether the Plaintiffs might be interested in those positions."  Dahlstrom Resp. [Doc. 104] at 13-14.  Plaintiffs contend that the position was created, and Ward and Quintana were hired to fill it, on August 18, just over a week after Plaintiffs met with the Lottery's attorney and informed her that they were supporting Lewis, and mere days after they signed their affidavits.  To be sure, adverse consequences involving

"promotion, transfer, recall after layoff, and hiring decisions" may form part of a First

Amendment retaliation claim "although not amounting to termination of employment or the

substantial equivalent of dismissal."  *Schuler v. City of Boulder*, 189 F.3d 1304, 1309 (10th Cir.

1999).  Plaintiffs' failure lies not in their allegations, but in their inability to offer evidence to

create a material issue of fact.

Defendants contend that, in July 2006, Defendant Romero eliminated a Sales Manager

position that was open due to a resignation, and created two Field Supervisor positions in its

place, which he filled on an interim basis with Ward and Quintana.  Dahlstrom MSJ [Doc. 92] at

11, 14 (UMFs 35 and 50).  Defendant Romero claims to have created the positions in July

following the resignation of the Sales Manager, Tom Fenner, which left no one to oversee the

LSRs.  Defendants maintain that all LSRs were informed of the creation of the new positions,

and told that Ward and Quintana would staff them on an interim basis, in a sales meeting on July

14.  The creation of the new positions in July, and the circumstances surrounding their creation,

is supported by deposition testimony from Defendant Romero, Scott Ward, and Yvette Quintana.

*See* Dahlstrom Reply [Doc. 117], Ex. V at 27-28, 31-32; Ex. W at 11-13; and Ex. X at 8-9.

Defendants' contentions are also supported by documentary evidence.  On July 21,

Defendant Romero informed the Lottery staff (including LSRs) via email that Tom Fenner, the

Sales Manager, had requested to rescind his letter of resignation, and that such permission had

been granted.  *See id.*, Ex. Y-2.  On July 24, Tom Fenner sent an email to all of the LSRs in

which he said: "Even though I have decided to continue on as your Sales Manager, until further

notice, please continue to communicate through your assigned field supervisor.  In other words,

Yvette and Scott will be the first line of communication as previously stated in your Sales

Meeting of 7/14/06." *Id.*, Ex. Y-1.  In August, Tom Fenner decided to resign again, this time for good.  On August 18, Defendant Romero sent an email to all Lottery staff informing them that Mr. Fenner had decided to take a position elsewhere and would be leaving on August 21, and that "Yvette Quintana and Scott Ward will be acting as field supervisors for sales representatives until further notice."  *Id.*, Ex. Y-3.

In their opposition to Defendants' motion for summary judgment, Plaintiffs dispute Defendants' claim that Ward and Quintana had been interim Field Supervisors since July.[7]  In the face of Defendants' testimonial and documentary evidence to the contrary, the only evidence that Plaintiffs point to as support for their contention that Ward and Quintana were hired in August rather than July is the August 18 email from Defendant Romero indicating that Ward and Quintana would be acting as Field Supervisors until further notice.  But this email does not contradict Defendants' contention, backed by testimonial and documentary evidence, that Ward and Quintana were selected for the interim positions in July, and that they continued in those positions after Mr. Fenner resigned for good in August; it is completely consistent with Defendants' explanation and evidence.  At no point do Plaintiffs offer any evidence to contest

---

[7] Plaintiffs dispute Defendants' UMF 50 which states, *inter alia*, that Ward and Quintana had been interim Field Supervisors since July due to the resignation of the sales manager.  *See* Dahlstrom MSJ [Doc. 92] at 14.  Defendants' UMF 35 states, *inter alia*, that in July, Defendant Romero eliminated an open Sales Manager position and created two Field Supervisor positions in its place.  *See id.* at 11.  In their briefs in opposition to Defendants' motions for summary judgment, Plaintiffs state that they do not dispute Defendants UMFs 1-40.  *See* Dahlstrom Resp. [Doc. 104] at 2.  Thus, by not disputing UMF 35, Plaintiffs have technically admitted that the positions had already been created in July even though in their brief they contradict this admission by arguing that the positions were not created until August 18.  *See id.* at 5.  In the interest of viewing the filings in the light most favorable to the non-movant, given that Plaintiffs dispute a closely related claim (UMF 50) in the same filing, and given that the Defendants did not raise this issue in their Reply brief, the Court will exercise its discretion in this instance and presume that this admission was an oversight on Plaintiffs' part.

the evidence presented by Defendants; they simply ignore Defendants' evidence and state that the positions were not created until August 18. This does not rise above the level of a mere allegation, and is insufficient to create a material question of fact. Because Plaintiffs do not offer evidence to dispute that the Field Supervisor positions were created in July and filled by Ward and Quintana at that time, well before Plaintiffs' August 10 meeting with the Lottery's attorney, their theory that they were retaliated against beginning on August 18 fails.

Plaintiffs' contention that they were not offered an opportunity to apply for the Field Supervisor position is also somewhat misleading. Although management chose in July to appoint Ward and Quintana on an interim basis without an open application process, it cannot be seen as retaliatory, as they had not yet met with the Lottery's attorney. Even if Plaintiffs had offered evidence to demonstrate that the positions were created on August 18, their retaliation claim would still fail because Defendants sent an internal email on August 30 to all Lottery staff (including Plaintiffs) seeking applications to fill the positions on a permanent rather than an interim basis. *See* Dahlstrom Reply [Doc. 117], Ex. Z-1. Finally, on October 2, after the positions had been held open for over a month, all Lottery staff were sent an email announcing that Ward and Quintana had been chosen to fill the permanent Field Supervisor positions. *See id.*, Ex. Z-2. Plaintiffs do not deny that they received the job posting inviting them to apply. *See* Dahlstrom Resp. [Doc. 104] at 14, n.4. Nor do any of them contend that they applied and were rejected. In fact, Defendants offer undisputed testimony that Plaintiffs never applied for the open positions. *See* Dahlstrom Reply [Doc. 117], Ex. Z at 2, ¶ 5. Plaintiffs' sole complaint is that the posting was made after Ward and Quintana were selected for the positions on an interim basis. Without any evidence that Plaintiffs applied for the position and were rejected, or

26

that they were told not to apply, Plaintiffs cannot point to any adverse employment action.

Modification of the Paid Time Off Policy

Plaintiffs claim that "[t]he Paid Time Off Policy was modified to substantially decrease the benefits the Plaintiffs received." Dahlstrom Resp. [Doc. 104] at 14. On December 14, 2006, the Lottery Board of Directors, which is not a Defendant in this suit, adopted a Leave Policy which replaced the previously applicable Paid Time Off Policy. *See* Dahlstrom Reply [Doc. 117], Ex. Z at 2, ¶ 9. The changes in this policy affected all Lottery employees, including Defendant Romero. *See id*. The changes to the policy were made in the midst of the severe budgetary challenges facing the Lottery, which are discussed throughout this opinion. Plaintiffs offer no evidence to indicate that they were affected by the changes to a greater degree than any other Lottery workers, nor do they even allege that the changes were implemented at the instigation of Defendant Romero. As such, the modifications to the Paid Time Off Policy do not constitute an adverse employment action in the context of a retaliation claim. *See Corneveaux v. CUNA Mut. Ins. Group*, 76 F.3d 1498, 1507 (upholding district court's dismissal of retaliation claim where plaintiff "was treated precisely the same as the other employees in the company").

Elimination of Sales Incentive Program

Plaintiffs also claim that "the quarterly bonuses were discontinued, costing Dahlstrom and his fellow Plaintiffs $6,000 in salary per year."[8] Dahlstrom Resp. [Doc. 104] at 14. In

---

[8] Claiming that the elimination of the sales incentive program cost Plaintiffs $6,000 in salary per year is extremely misleading. The incentive program was not part of an LSR's salary, or a guaranteed payment, but rather was a bonus plan that enabled LSRs to make a maximum of $1,500 per quarter if their retailers met certain goals. *See* Dahlstrom Reply [Doc. 117], Ex. V at 87. In fact, in fiscal year 2006, Dahlstrom's incentive payment was only $2,600, Lucero's was $3,000, Minter's was $2,000, and Claudia Romero's was $4,800. *See id*., Ex. Z at 3, ¶ 18.

December 2006, Defendant Romero announced to staff that he was discontinuing sales incentive bonuses.  *See* Dahlstrom Reply [Doc. 117], Ex. V at 86-87.  In addition to eliminating the incentive plan for all of the LSRs, the Lottery also eliminated the incentive program for the Customer Service Representatives ("CSRs"), Director of Sales, Field Supervisors, CSR Supervisor, Key Account Manager, and the retailers.  *See id.*, Ex. Y at 1-2, ¶ 4.  As with the modification of the Paid Time Off Policy, this money-saving measure was undertaken during a time of budget challenges.  Plaintiff has presented no evidence that the elimination of the sales incentive program, affecting numerous employees and undertaken four months after they filed their affidavits, was in any way connected to their support of Lewis.

<u>Expansion of Plaintiffs' Sales Territories</u>

Plaintiffs Dahlstrom, Minter, and Claudia Lucero contend that they were forced to resign their positions because their sales territories were expanded in February 2007, and again in April of that year, to such a degree that their jobs became impossible to perform, and that their positions were restructured in retaliation for their execution of affidavits in the *Lewis* case.  As an initial matter, the Court notes that Plaintiffs face an extremely difficult task in demonstrating a retaliatory motive for actions that occurred six and eight months after the affidavits were executed, especially in light of the undisputed economic hardships facing the Lottery.[9]  *See Maestas*, 416 F.3d at 1189 ("a long delay between the employee's speech and the challenged conduct, or evidence of intervening events, tend[s] to undermine any inference of retaliatory

_____

[9] Certainly retaliatory actions that occur months after protected conduct can be actionable if they are part of a pattern of retaliation.  *See Marx v. Schnuck Markets, Inc.*, 76 F.3d 324 (10th Cir. 1996).  In this case, however, the Court has found no instances of retaliation leading up to the February expansion of territories, and, therefore, no pattern.

motive and weaken the causal link") (citations omitted).

The environment in which the Lottery was operating at the time of the February and April sales territory expansions is captured by the following material facts, undisputed by Plaintiffs.  Defendant Romero became the Lottery's CEO in August 2006, after serving as the interim CEO since the end of November 2005.  *See* Dahlstrom MSJ [Doc. 92] at 10 (UMF 34).  Also in August 2006, a public policy organization called Think New Mexico issued a report entitled: "Averting the Crisis: Making Lottery Success Scholarships Sustainable."  The report addressed projections indicating that the Lottery's tuition fund faced a potential shortfall of $18 million in 2011.  *See id*. at 11 (UMF 36).  The Think New Mexico report proposed that the Lottery cut operating and administrative costs, and recommended that the Legislature pass a bill requiring the Lottery to provide at least 30% of its gross revenues to the tuition fund.  *See id*. (UMF 37).  Think New Mexico informed the Lottery that it had been talking to legislators and was working on just such a bill, which it hoped would be introduced in the 2007 legislative session.  *Id*.  Recognizing that the legislation would probably be introduced and passed, Defendant Romero instructed his staff to look at ways to cut costs and expenses.  *See id*. (UMF 38).  Toward the end of 2006, as part of its efforts to reduce costs, the Lottery eliminated several positions and eliminated the sales incentive plan for the 2008 fiscal year.  *Id*.

During the 2007 legislative session, Senate Bill 364 was introduced.  The initial version of the bill required the Lottery to return 30% of its gross revenues to the tuition fund by July 1, 2007.  *See id*. at 12 (UMF 39).  The Lottery assumed that the bill would be passed and signed into law, and, in preparation for the anticipated new requirements, the Lottery continued looking at its staffing levels and expenditures to determine where it could reduce its costs.  *See id.*; UMF

40.

The bill that was ultimately passed and signed required the Lottery to return at least 27% of its gross revenues to the tuition fund from July 1, 2007, until December 31, 2008, and 30% thereafter.  *See id*. (UMF 44).  In past years, the Lottery had returned, on average, about 24% of its gross revenues to the tuition fund.  *See id*. at 12-13 (UMF 45).  In order to be able to meet the new requirements, the Lottery had to reduce operating expenses by approximately $6 million. *Id*.  On March 22, 2007, Defendant Romero presented to the Lottery Board a revised fiscal year 2007 budget and plan for restructuring the Lottery and reducing costs in order to meet the new financial requirements.  *See id*. at 13 (UMF 47).  As required, the revised budget cut operational expenses by approximately $6 million, including nearly $500,000 in eliminated staff positions, nearly $300,000 in benefits and incentives, several million dollars in prize percentage payouts, and over $1 million in advertising.  *Id*.  On April 2, 2007, the Lottery eliminated three LSR positions and a part time staff auditor position.[10]

The Lottery contends that "[a]fter careful consideration and review of current positions at the Lottery, and after an extensive analysis of the operating costs, the Lottery made the determination that a reduction in staff and restructuring of other positions was necessary as part of the overall cost reductions and efficiency improvements."  UMF 46.  Despite admitting all of the previous facts regarding the Lottery's economic situation in late 2006 and early 2007,

---

[10] Although Plaintiffs admit that the Lottery needed to reduce its operational expenses by $6 million to meet the new requirements, they question a number of line items in the new budget, such as raises for certain employees and spending on new equipment for Lottery security officers.  While various items may or may not have been a wise use of funds, they do not demonstrate that the Lottery did not have to reduce its spending by $6 million, and the Court will not second guess the Lottery's business decisions when it is undisputed that deep spending cuts were needed.

including that the Lottery had been analyzing staffing levels to determine where it could reduce

costs, UMF 40, and that the Lottery had eliminated certain positions as part of its efforts to

reduce costs, UMF 38, Plaintiffs dispute UMF 46 and allege that Plaintiffs Dahlstrom, Minter,

and Claudia Romero's "positions were restructured for the sole [purpose] of forcing them to

leave their positions in retaliation for the execution of the [Lewis] affidavit." Dahlstrom Resp.

[Doc. 104] at 2. However, Plaintiffs do not offer any evidence to support this assertion and fail

to create a triable question of fact.

On February 12, 2007, the LSRs were given revised sales territories. Of the ten LSRs,

eight of them saw an increase in the number of retailers that they were assigned. *See* Dahlstrom

MSJ [Doc. 92] at 14-15 (charts contained in UMF 52 and 56, showing the number of retailers per

LSR in January and February). The Lottery contends that the LSRs' territories were revised in

order to enable Ward and Quintana to focus more on their supervisory duties. UMF 56. Prior to

the February revision, Ward handled 52 stores and Quintana handled 105 stores in addition to

their duties as Field Supervisors. UMF 52. Following the February revision, Ward and

Quintana were responsible for 39 stores each in their territories, with the stores they had

previously been responsible for spread out among the other LSRs. UMF 56. Plaintiffs contend

that the Lottery's purpose in reducing the number of retailers that Ward and Quintana were

responsible for, and instead spreading them out amongst the other LSRs, was not to allow them

to focus on their supervisory duties, but rather to overwhelm Plaintiffs in order to force them to

resign. Dahlstrom Resp. [Doc. 104] at 3. However, Plaintiffs do not offer any evidence that the

revisions in territories necessitated by reducing Ward and Quintana's duties came at the behest

of Defendant Romero or were designed to retaliate against them.

31

First, two LSRs that did not sign affidavits saw their territories increased significantly more than any of the Plaintiffs as a result of the February 12 revision.  Anna Gonzales had her number of retailers increased by almost 27% and Regina Maldonado saw a 23% increase. Among Plaintiffs, Minter had an increase of 14.8%, Dahlstrom of 8%, and Claudia Romero of 3.6%.  *See* Dahlstrom MSJ [Doc. 92] at 14-15 (charts contained in UMF 52 and 56, showing the number of retailers per LSR in January and February).

Second, Plaintiffs offer no evidence that Defendant Romero was involved in making the territorial changes, only that he was aware reductions in Ward and Quintana's retail load. Plaintiffs admit that Ward and Quintana were not aware that they had signed affidavits in the *Lewis* case, UMF 74, and do not allege that Ward and Quintana retaliated against them.  Instead, they dispute Defendants' contention that Ward and Quintana created the February sales territories, alleging that they were created by Pat Beare with the approval of Defendant Romero. Dahlstrom Resp. [Doc. 104] at 3.  As the only evidence to back up their allegation, Plaintiffs cite the depositions of Beare and Defendant Romero.  But Romero's deposition, including the portion cited by Plaintiffs, indicates that Beare had approached Defendant Romero asking to reduce the number of stores for which Ward and Quintana were responsible, so that they could devote more time to supervising the LSRs.  *See id.*, Ex. 6 at 92, 100.  Beare's deposition, including the portion cited by Plaintiffs, confirms that he approached Defendant Romero with a proposal to reduce the number of stores overseen by Ward and Quintana.  *See id.*, Ex. 7 at 74-76.  Nothing in either deposition contradicts the Lottery's assertion that Ward and Quintana designed the LSRs' territories themselves once they had their number of stores reduced, or that anyone other than Beare, against whom all affidavit-related retaliation claims have been dropped, was responsible

32

for seeking a reduction in the number of stores overseen by Ward and Quintana.  As a result, Plaintiffs have offered no evidence pointing to a retaliatory action by Defendant Romero in connection to the revised February territories.

On February 13, Plaintiff Dahlstrom had his territory significantly increased again. Plaintiffs do not dispute that Trevas Younger, the only other Las Cruces-based LSR besides Dahlstrom, resigned on February 7, effective February 20.  Nor do they dispute that Ms. Younger's retailers needed to be covered, or that much of Ms. Younger's territory was assigned to Dahlstrom while parts of Dahlstrom's territory were assigned to two other LSRs and Ward. Plaintiff Dahlstrom only disputes the Lottery's contention that his territory was expanded due to the resignation of Ms. Younger, and contends that the reassignment was just part of a plot to overwhelm him so that he would resign.  However, he offers no evidence that it was illogical for him to be assigned, on a temporary basis, the territory of the other Las Cruces-based LSR, nor any evidence to dispute the Lottery's assertion that it was Baere, as opposed to Defendant Romero, that made the reassignment.

Finally, on April 9, 2007, all of the remaining LSRs were again assigned revised territories.  Each of the LSRs, except for Plaintiff Romero, who saw a decrease in retailers, was assigned more retailers, with some of the retail accounts changed from having to be seen weekly to being seen monthly.  These revisions followed the layoffs, the previous week, of Plaintiff Lucero and another LSR, which came at a time when the LSR position left open by Trevas Younger's resignation remained to be filled.  It also coincided with a reduction in the number of stores that Ward and Quintana were responsible for from 39 each to 4 each.

Plaintiff Dahlstrom called in sick on April 10, visited some Las Cruces retailers on April

11 and 12, but did not visit those that were added to his route, and resigned by emailing his resignation to Defendant Romero on April 13, effective that day.  Plaintiff Minter called in sick on April 10-13, and resigned by emailing his resignation to Defendant Romero on April 13, effective that day.  Plaintiff Claudia Romero did her route for 6 working days and then emailed her resignation to Defendant Romero on April 20, effective that day.

Plaintiffs dispute Defendants' contention that all of the LSRs had their territories increased due to the layoffs and the restructuring of Ward and Quintana's sales territories, but, once again, offer no evidence to tie this action to the signing of affidavits eight months earlier. They do not explain how expanding every LSR's territory in light of a 30% reduction in sales staff was punishment directed toward them, nor do they allege that their new territories were more onerous than those of the LSRs who had not signed affidavits.  Indeed, Plaintiff Claudia Romero actually saw her number of retailers drop by over eight percent while everyone else's increased.  *See* Dahlstrom MSJ [Doc. 92] at 15, 17 (charts contained in UMF 56 and 62, showing the number of retailers per LSR in February and April).

As with the February restructuring, Plaintiffs say that they dispute that the April routes were conceived by Ward and Quintana, who admittedly had no retaliatory intent, but they cite no evidence to call into question Ward and Quintana's sworn testimony on this subject.  *See* Dahlstrom MSJ [Doc. 92], Ex. S at 2, ¶ 5; Ex. T at 1, ¶ 4.  Instead, they argue the somewhat related point that Baere and Defendant Romero jointly made the decision to reduce the number of retailers that Ward and Quintana were responsible for so that the Plaintiffs' workload would be substantially increased.  However, a close look at the portion of Defendant Romero's deposition cited by Plaintiffs demonstrates that Beare approached Defendant Romero with the

request to significantly decrease Ward and Quintana's retail load again.  *See* Dahlstrom Resp.

[Doc. 104]**,** Ex. 6 at 104-105.  If Beare, who Plaintiffs do not allege had retaliatory intent related

to the affidavits, instigated the reduction in retailers for Ward and Quintana, then the increase in

work for the LSRs resulting from that reduction could not have been retaliatory, and Plaintiffs

Dahlstrom, Minter, and Claudia Romero's final claim of retaliation fails.

Because Plaintiffs have failed to demonstrate any causal connection between their

conduct in signing the affidavits and the employment actions that led them to resign, their

common law retaliatory discharge claim fails as well.  In addition, the Court notes that Plaintiffs

have failed to meet their substantial burden, required for a claim of constructive discharge, to

demonstrate that a reasonable person in the employee's position would view their working

conditions as so intolerable as to preclude any choice but to quit.  *See Exum v. United States*

*Olympic Comm.*, 389 F.3d 1130, 1134-35 (10th Cir. 2004).  Indeed, not only did Plaintiffs not

attempt to do their newly assigned routes, but, in response to the Lottery's evidence claiming

that Plaintiffs' replacements were handling with no problem the approximate number of retailers

that was assigned to each Plaintiff when they resigned, Plaintiffs merely say "under no

circumstances could anyone handle the same territory...with 'no problem." Romero Resp. [Doc.

107] at 3.  This response is clearly insufficient to create a question of fact.

<u>Layoff of Plaintiff Lucero</u>

On April 2, 2007, Plaintiff Lucero was laid off along with another LSR, Glenda Bixler,

and a staff auditor, John Gentry.  Lucero's layoff came shortly after his March 16 email

questioning the manner in which the Lottery chose to end games with prizes remaining to be

claimed.  An adverse action in close proximity to protected speech may warrant an inference of

retaliatory motive.  *See Baca*, 398 F.3d at 1221.  But temporal proximity, by itself, is insufficient to establish such speech as a substantial motivating factor in an adverse employment decision, especially in light of contrary evidence.  *See Maestas*, 416 F.3d at 1189.

Defendants have offered substantial evidence to demonstrate that they had slated Plaintiff Lucero for layoff, as part of a money-saving restructuring, long before he sent the email.  Pat Beare signed an affidavit attesting that, on February 21 or 22, he gave a memorandum entitled "Store Service-Alternatives" to Defendant Romero.  Dahlstrom MSJ [Doc. 92], Ex. G at ¶ 3.  This 19 page memorandum presented four very detailed options for reducing expenses and making the LSR territories more efficient.  *See id.*, Ex. G-1.  "Option A," which kept the current sales structure but with fewer LSRs and a reduction in service to smaller retailers, envisioned the layoffs of Plaintiff Lucero and Glenda Bixler.  *See id.* at 2-3.  The memorandum was discussed at a February 23 meeting of the Lottery's Executive Management Team.  *See id.*, Ex. K at ¶3.  At his deposition, Defendant Romero testified that within a week of that meeting, the decision was made to implement Option A.  *Id.*, Ex. H at 132-33.

In order to get around Defendants' proof that they had decided to eliminate his position before he sent his email, Plaintiff Lucero questions whether Beare's store service alternatives memo even existed prior to his layoff.  Lucero Resp. [Doc. 105] at 8.  Lucero then claims that *if* the memo existed prior to his email, instead of being fabricated after the email to justify his layoff, it did not recommend his layoff but rather that of another LSR, and his name was only inserted after the fact.  *See id.*  These exceptionally serious charges of evidence fabrication and fraud on the Court amount to nothing more than "[s]peculation or hunches admidst rumor and innuendo" and do not suffice to create a question of fact without evidence to back them up.

36

*Maestas*, 416 F.3d at 1189.

Plaintiff Lucero offers no evidence of fabrication, arguing instead that his layoff must have been pretextual because he thinks someone else should have been laid off instead. But all of Lucero's arguments amount to nothing more than an invitation to the Court to second-guess the Lottery's business judgment. For instance, Lucero claims that "[a]lthough any legitimate layoff scheme has an objective component and looks at the seniority of employees, the Lottery claims that seniority was irrelevant." Lucero Resp. [Doc. 105] at 8. But he does not cite any law requiring an employer to take seniority into account. Indeed, if the Lottery's goal is to cover all of the territories in the state in the most efficient manner and with the fewest representatives possible, it would make no sense to leave someone in a position that does not have sufficient retailers to justify a full time staff member simply because of their seniority while eliminating someone from a centrally-located position because they were less senior.

Lucero also speculates that the memo must have been falsified because, after the layoffs, two positions still remained open and he was not offered either of the positions. In fact, only one full-time position was open, in Albuquerque, and one part-time position, in Silver City. *See* Lucero Reply [Doc. 118], Ex. H. While neither Lucero nor Glenda Bixler, who was laid off at the same time, were transferred to an open position, both were encouraged to apply for the open positions. Despite being told that, because taking one of the open positions would require him to relocate, he would be able to keep the eleven weeks of severance pay and $2,500 in job search assistance that the Lottery gave him even if he was successful in applying for one of the open positions, Lucero did not apply. Ultimately, Lucero has offered no evidence to back up his inflammatory claim that Defendants fabricated the February memo that recommended his layoff

37

and, thus, cannot show that his email was a substantial motivation for his layoff.

## CONCLUSION

The Supreme Court has explained that "the First Amendment is not a tenure provision" and does not protect government employees from legitimate employment decisions. *Rutan v. Republican Party*, 497 U.S. 62, 76 (1990). A government employee, "by engaging in constitutionally protected speech, ought not be able to prevent his supervisor from assessing employment needs and making decisions on the basis of those needs." *Maestas*, 416 F.3d at 1192. The Court's role is not to second-guess the Lottery's method of restructuring, even if it resulted in layoffs or extra work for Plaintiffs, it is only "to determine whether Plaintiffs have presented evidence such that a jury reasonably might find a substantial motivating factor in that decision was Plaintiffs' protected speech." *Id*. at 1190. The Court holds that they have not.

**IT IS THEREFORE ORDERED** that Plaintiffs' *Motion for Summary Judgment Concerning Property Interest Claim* [Doc. 82] is DENIED, Defendants' *Motion for Summary Judgment on the Claims brought by Plaintiff Ken Dahlstrom* [Doc. 92] is GRANTED, Defendants' *Motion for Summary Judgment on the Claims brought by Plaintiff Anthony Lucero* [Doc. 93] is GRANTED, Defendants' *Motion for Summary Judgment on the Claims brought by Plaintiff John Minter* [Doc. 94] is GRANTED, and Defendants' *Motion for Summary Judgment on the Claims brought by Plaintiff Claudia Romero* [Doc. 95] is GRANTED.

JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE